# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JANE DOE,

                    Plaintiff,

v.

COUNTY OF MILWAUKEE,
DAVID A. CLARKE, JR.,
XAVIER D. THICKLEN, and
JOHN/JANE DOE,

                    Defendants,

and

WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

                    Intervenor.

Case No. 14-CV-200-JPS

**ORDER**

## 1.     INTRODUCTION

On August 31, 2016, the defendants David A. Clarke, Jr. ("Clarke") and the County of Milwaukee (the "County") (collectively, "Defendants"[1]), and the intervenor Wisconsin County Mutual Insurance Corporation ("WCMIC"), filed separate motions for summary judgment. (Defendants' Motion, Docket #132; WCMIC's Motion, Docket #129). Each motion was accompanied by a statement of facts, brief in support, and for Defendants, a number of affidavits and exhibits. *See* (WCMIC's Statement of Facts, Docket #130; WCMIC's Brief in Support, Docket #131; Defendants' Brief in Support,

---

[1] Though there are additional defendants, namely Xavier D. Thicklen ("Thicklen") and other John/Jane Does, they have not participated in the briefing directly. On October 22, 2016, Thicklen moved to join in Doe's response to WCMIC's motion, as it implicates the potential for insurance coverage for his unlawful conduct alleged by Doe. (Docket #151). WCMIC's motion appears to be directed to this matter generally, not specifically at Doe. *See* (Docket #129). Thus, the Court will permit Thicklen to join in Doe's briefing in opposition, at his own peril of course.

Docket #133; Defendants' Statement of Facts, Docket #134, Affidavits in Support of Defendants' Motion, Docket #135 and #136). On October 21, 2016, the plaintiff Jane Doe ("Doe") offered her responses in opposition to each motion, responses to each statement of facts, her own unified statement of facts, and an affidavit of counsel attaching exhibits. *See* (Affidavit of Doe's Counsel, Docket #145; Doe's Statement of Facts, Docket #146; Brief in Opposition to Defendants' Motion, Docket #147; Response to Defendants' Statement of Facts, Docket #148; Brief in Opposition to WCMIC's Motion, Docket #149; Response to WCMIC's Statement of Facts, Docket #150). On November 4 and November 7, 2016, respectively, WCMIC and Defendants submitted replies in support of their motions and responses to Doe's statement of facts. *See* (WCMIC's Reply, Docket #153; WCMIC's Response to Doe's Statement of Facts, Docket #152; Defendants' Reply, Docket #156; Defendants' Response to Doe's Statement of Facts, Docket #154). The motions are fully briefed and, for the reasons explained below, they will be granted in part and denied in part. As they deal with interrelated issues, the Court addresses both motions in this Order.

2.      **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable

to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [her] case is convincing, [she] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3.     RELEVANT FACTS**

The following facts are gleaned from the parties' collective factual briefing. They have been construed, as required by the standard of review, in a light most favorable to Doe. The Court will provide a timeline of the underlying events and then a discussion of other relevant topics. To the extent the parties dispute any material facts, the Court addresses the disputes as necessary.[2]

---

[2]Citations to any party's factual briefing may reference the asserted fact and/or the response thereto.

The Court further notes that WCMIC joined entirely in Defendants' response to Doe's statement of facts. For clarity and brevity, however, the Court will refer to these responses as if they came solely from the Defendants.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 3 of 37   Document 157

### 3.1    Thicklen's Sexual Assaults on Doe in 2013[3]

In February 2013, Doe was detained at the Milwaukee County Jail (the "Jail"). The Jail houses up to 960 inmates at any time, and approximately 35,000 inmates are booked into the Jail each year. Thicklen was a correctional officer at the Jail during Doe's stay, one of as many as sixty-five on duty at any particular time. Throughout these events, he always wore his uniform while on duty and carried a taser, as required by Jail policy. Doe first met Thicken in April, when he was on-duty as a "clinic transport officer." He used this position to move Doe from her normal cell to the Jail clinic. Once in a clinic holding cell, he sexually assaulted Doe by putting his hands down her pants, and later ordered her to show him her breasts.

In July, Thicklen again used his authority, this time as a "floor control officer," to take Doe to an attorney booth and assaulted her by forcing her to have anal intercourse. A nearly identical assault occurred in September, save that this time, Thicklen forced vaginal intercourse with Doe. When Doe opposed Thicklen's advances, he said "[t]hese are my co-workers. They're going to believe me, not you. I'm in gray, you're in blue." (Docket #154 at ¶ 5).

The next assault was committed in October. Thicklen was working in the infirmary, known as the "Special Medical Unit" ("SMU").[4] Doe had given birth a few days before, and was therefore housed in the SMU to recover. Thicklen entered Doe's SMU cell and forced her to perform oral sex.

---

[3]The parties disagree on some of the specifics of each assault. (Docket #148 at ¶¶ 104-119). The disputes are of no moment; the material facts about when and where the assaults occurred are not disputed. Further, the issues in the instant motion do not turn on what is disputed. The Court will, therefore, not treat these as material disputes, and will construe the facts in Doe's favor.

[4]The Jail's clinic and the SMU are different places.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 4 of 37   Document 157

The final assault occurred in November. Thicklen was again a "clinic transport officer," and like the first incident, he moved Doe to the Jail clinic and assaulted her. Thicklen compelled Doe to have oral and anal intercourse. This time, Thicklen moved Doe by removing her "tier card" (an item used in the Jail to monitor inmate movement) without authorization.

Doe filed a grievance about Thicklen's assaults on December 3. This was the first time she told any Jail officials about her sexual encounters with Thicklen. An investigator from the Sheriff's Office's Criminal Investigations Division, Detective Desotell ("Desotell"), interviewed Thicklen later that day. Thicklen, without being told why he was being questioned, stated that Doe was trying to "kill his life" and that he was worried about "spend[ing] his life in jail." (Docket #154 at ¶ 11). Desotell then interviewed Doe, also on December 3. Desotell continued his investigation by interviewing other witnesses, including re-interviewing Thicklen and Doe at a later time, and reviewing Thicklen's time cards and assignments, Doe's attorney visit and clinic appointments, and video from Jail cameras. He concluded that Thicklen did commit the assaults as Doe had alleged. Specifically, Desotell found that Thicklen had created a fake clinic appointment to move Doe for the November assault, and had contrived an attorney visit for the July assault.

On December 5, the investigation was referred to the Sheriff's Office's Internal Affairs division. On December 6, Thicklen hired a criminal defense attorney. On December 9, Thicklen was suspended without pay, and later that day, he resigned from his position with the Jail. Based on his investigation, Desotell issued a "probable cause statement" on January 8, 2014, presumably to support criminal charges against Thicklen.

Thicklen was arrested on January 7. On January 17, the Milwaukee County District Attorney charged Thicklen with five counts of sexual assault.

Thicklen pled guilty to the lesser charge of misconduct while in public office, while continuing to deny that the assaults ever occurred. Paul Tiffin ("Tiffin"), the prosecutor assigned to Doe's case, stated that he agreed to enter into a plea agreement with Thicklen to ensure that he was convicted, and thus unable to continue working as a correctional officer and to assault other female inmates.

### 3.2 Past Sexual Assaults in the Jail

On March 7, 2009, correctional officer James Howard ("Howard") sexually assaulted two female inmates in the Jail.[5] To assault the first inmate, Shanika Thomas ("Thomas"), Howard moved her to an area beyond the scope of the Jail's video surveillance.[6] Howard spent time alone with the second victim, Marletha Rankins ("Rankins"), in her cell, where two assaults

---

[5]Doe asserts that another officer, Aaron Heine ("Heine"), assaulted an inmate on July 26, 2005. (Docket #154 at ¶ 25). For support, Doe cites 1) a civil complaint filed by that inmate in this Court, and 2) an order by this Court on a motion to bifurcate and stay. *Id.* Defendants object that these documents cannot support a statement of fact at the summary judgment stage. *Id.* Defendants are correct; allegations in a complaint are not evidence, and the Court's order does not actually find any facts, but merely states them as background for its ruling. *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012). Thus, the Court cannot take the Heine assault as a fact for the purposes of this Order. However, as discussed below, the Court's ruling on a motion to dismiss filed in the Heine lawsuit provides relevant precedent. *Estate of Watts v. Heine et al.*, No. 07-CV-644-JPS, 2008 WL 4058032 (E.D. Wis. Aug. 26, 2008).

The Court takes the Howard facts as true since Defendants do not dispute the underlying substance of the Howard incidents.

[6]Defendants appear to dispute that Howard's *movement* of the inmate was not captured on video, but not that the rape itself took place in a cell that was not under video surveillance. (Docket #154 at ¶ 27). Doe's version of events is supported by the incident report. (Docket #145-44 at 7).

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 6 of 37   Document 157

occurred.[7] Clarke recommended that Howard be discharged on March 12, 2009, and Howard resigned on March 31, 2009. On September 17, 2010, Howard was found guilty of sexual assault and sentenced to four and a half years in prison.

Rankins sued Howard and the County (Clarke was also a named defendant), alleging that the County failed to appropriately supervise male correctional officers' interactions with female inmates. Specifically, she contended that the County did not have a policy requiring appropriate video or other electronic means of surveillance for monitoring officer

---

[7]Doe claims that the assaults happened because Howard was not "being monitored either through cameras, electronic surveillance[,] or a female escort." (Docket #154 at ¶ 28). She cites the civil complaint filed by Rankins and this Court's order on a summary judgment motion in that case. *Id.* As before, Defendants dispute these citations as ineffective to support the asserted fact. This remains true. The complaint states mere allegations and the summary judgment motion did not find facts, but instead noted a *dispute* of facts precluding judgment in favor of either party. *See Rankins v. Howard*, No. 11-CV-1153-JPS, 2012 WL 5932029 *3 (E.D. Wis. Nov. 27, 2012). Again, the Court cannot take Doe's assertion as fact, but the Court's summary judgment ruling in the Howard case offers applicable precedent. *Id.* As shown by the *Rankins* opinion, however, the monitoring issues Doe cites did arise in the lawsuit and are thus at least arguably relevant to Defendants' notice thereof, discussed *infra* Part 4.1.2.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 7 of 37   Document 157

activity.[8] Thicklen is Howard's brother-in-law and was aware that Howard was convicted, and imprisoned, because he sexually assaulted a Jail inmate.

Aside from Thicklen's conduct, and including the three Howard assaults, there were a total of ten alleged incidents of sexual misconduct in the Jail from 2008 to 2013.[9] Among those, the Sheriff's Office investigations found that four incidents were substantiated, while the others were not. The Court groups them below.

### 3.2.1 Substantiated

The Howard assaults comprise three of the four substantiated instances of sexual misconduct. The other assault occurred in October 2010. The Sheriff's Office found a letter suggesting a sexual relationship between officer "D.W." and an inmate. The investigation involved interviews, reviewing recorded phone calls, and reviewing photographs D.W. sent to

─────────────────────────────

[8]Doe asserts that "[t]estimony from that lawsuit indicates there was no policy requiring officers to monitor the cameras which capture activity in the housing unit." (Docket #154 at ¶ 29). Defendants counter that the testimony, from the correctional officer working with Howard at the time of his assault, instead stated that no policy required the officer to monitor *Howard's* movement on camera. *Id.* The testimony itself more closely follows Defendants' characterization. (Docket #145-17 at 11:1-19). Thus, Defendants have adequately disputed the fact and the Court cannot find it established for purposes of this Order. This is not to say that a differently worded fact would be rejected, such as one tracking Defendants' narrower characterization of the testimony, but that is not the fact which Doe offered. In any event, Defendants' characterization appears to aid, rather than harm, Doe's argument regarding lack of officer monitoring.

[9]Doe states that Defendants' proposed number of incidents, eight, fails to account for Heine and Howard's multiple assaults. (Docket #148 at ¶ 68). The Heine assaults allegedly occurred in 2005, so they fall outside the stated period. In any event, as indicated above, the Court cannot take them as fact. *See supra* n.5. Counting the multiple Howard assaults, as well as the others identified by Defendants, the Court notes ten incidents. Because of the posture of this motion, the Court must construe the fact as Doe suggests.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 8 of 37   Document 157

the inmate. The investigation concluded that D.W. probably engaged in sexual acts with the inmate. However, the inmate denied having sex with D.W. and the District Attorney declined to bring charges against him. Nevertheless, Internal Affairs opened its own investigation, and Clarke filed charges against D.W. with the Personnel Review Board seeking his discharge. D.W. resigned before the charges could be heard by the Board.

### 3.2.2 Unsubstantiated

In June 2012, an inmate complained of a sexual relationship between a female officer "L.J." and another female inmate. The investigation found no evidence to support the allegations. In February 2013, a male inmate alleged that a male officer "R.S." inappropriately touched him during a "shakedown." This complaint was determined to be unfounded. In June 2013, an inmate complained that an unnamed officer grabbed his testicles while the inmate was being moved in the Jail. The investigation was closed because the complaining inmate refused to cooperate. In December 2013, officer "Q.W." allegedly grabbed an inmate's penis and buttocks during a search. The investigators reviewed video of the search, finding that Q.W. had followed standard search procedure. Also in December 2013, an inmate alleged that officer "N.S." slapped his buttocks, but due to the inmate's inconsistent statements and the lack of corroborating witnesses, the investigation was closed. Finally, in January 2013, an inmate complained that an unidentified officer had sexually assaulted her in April 2012. The inmate could not recall anything specific about the incident because she had "blacked out," and no other supporting evidence was found, so the complaint was closed.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 9 of 37   Document 157

### 3.3 Policies and Training Regarding Sexual Assault

Clarke, the Milwaukee County Sheriff, had final responsibility for Jail policies and procedures at all times relevant. The Milwaukee Sheriff's Office Detention Services Bureau (the "Bureau"), however, actually operates the Jail and sets its policies. Jail employees are required to read and follow the Bureau's policies. At issue here is the Staff Sexual Conduct Policy ("AM 7"), which prohibits "any form of sexual misconduct by staff with [inmates]." (Docket #148 at ¶ 13). AM 7's purpose is to ensure that Wisconsin law proscribing sex between correctional officers and inmates "is strictly enforced." *Id.* at ¶ 11. It is further described as a zero-tolerance policy. AM 7 defines sexual misconduct to include sexual contact, intercourse, and assault, as well as verbal sexual misconduct, and provides examples of physical sexual misconduct. The Sheriff's Office maintains a system to track sexual misconduct charges against correctional officers. Violations of AM 7 are investigated by multiple Sheriff's Office departments and can potentially result in referral to the Milwaukee County District Attorney or internal discipline. The County's "Rules" policy informs all employees, including correctional officers, that they may be subject to discharge, suspension, or demotion for violating a County policy or criminal law.

All Jail officers are trained at the Sheriff's Office Training Academy. Their training addresses sexual assault specifically, defining what is prohibited by Wisconsin law, teaching officers to avoid sexual misconduct, and training them on minimizing fraternization with inmates. Officers are further instructed that sexual misconduct with an inmate is a specifically enumerated Class C felony in Wisconsin. That statute provides:

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 10 of 37   Document 157

(2) Second degree sexual assault. Whoever does any of the following is guilty of a Class C felony:

. . .

(h) Has sexual contact or sexual intercourse with an individual who is confined in a correctional institution if the actor is a correctional staff member.

. . .

(4) Consent. "Consent", as used in this section, means words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse or sexual contact. Consent is not an issue in alleged violations of sub. (2). . .(h)[.]

Wis. Stat. § 940.225(2)(h) and (4). The statute further defines "sexual contact" and "sexual intercourse" and those definitions are provided in the officers' training materials. The materials go on to summarize the rule:

The lesson of this statute is very clear: **Do not have any sexual contact or sexual intercourse with inmates <u>under any circumstances</u>, whether or not they consent to such contact or intercourse**. Such conduct is clearly grounds for you to be charged criminally. It is also totally unethical and unprofessional conduct. There is no excuse or justification for such conduct, <u>under any circumstances</u>.

(Docket #136-4 at 46) (emphasis in original). The officers' training manual then provides examples of prohibited behavior which may go beyond the purview of the statute, to include sexual discussions, comments, inappropriate non-intercourse touching, and hugging or kissing.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 11 of 37   Document 157

Thicklen was trained in accordance with these rules. He was hired as a Jail officer on November 5, 2012.[10] Prior to his hiring, Thicklen was subject to a background check regarding, *inter alia*, his criminal and employment history. That investigation did not reveal a criminal record or other indication of a concern for sexual misconduct. Thicklen completed the Jail officer training program on December 13, 2012. This included training on sexual assault, fraternization with inmates, and sexual misconduct. Thicklen admitted that he received this training and specifically that he was told it was a crime to have sex with an inmate. Thicklen further admitted that he received the County's policy handbook, which included AM 7.

---

[10]Sheriff's Office Deputy Inspector James Cox ("Cox") offers testimony on Thicklen's hiring and training. (Docket #148 at ¶¶ 34-40). Doe objects that Cox does not testify based on personal knowledge, does not otherwise note the source of his knowledge, and was not disclosed as a witness pursuant to FRCP 26(a)(1). *Id.* In a footnote in their reply brief, Defendants counter that Cox was disclosed as a witness on April 3, 2015, after the County's initial FRCP 26(a) disclosures were issued. (Docket #156 at 4, n.1). They also submit that given his position, Cox may testify about the County's training procedures, policies, investigations it conducted. *Id.* Finally, Defendants maintain that he may base this testimony on his review of the County's business records. *Id.*

The Court finds that Cox offers competent, admissible testimony. FRCP 26(a) disclosures may be supplemented, Fed. R. Civ. P. 26(e)(1)(A), and it appears Defendants did so. Cox also acts as the County's representative, as he signed the entity's responses to Doe's discovery requests. As a County employee and representative, Cox is permitted to obtain his knowledge by reviewing relevant County records, and such "business record" testimony is excepted from the rule against hearsay. *See* (Docket #155 at ¶¶ 3-5); Fed. R. Evid. 803(6); *St. Paul Fire & Marine Ins. Co v. Schilli Transp. Servs., Inc.*, No. 08-CV-176, 2011 WL 1743480 *4 (N.D. Ind. May 5, 2011) ("[T]here is a general presumption that an employee or corporate representative has personal knowledge, sufficient to attest to matters relating to the business entity."), *rev'd on other grounds*, 672 F.3d 451 (7th Cir. 2012). In any event, Doe's objection to Cox's testimony is limited to these procedural grounds; she does not contest the truth of his sworn statements. (Docket #148 at ¶¶ 34-40).

### 3.4 Thicklen's Duties and Authority in Relevant Roles

In certain roles, correctional officers are required to escort inmates around the Jail as part of their duties. "Clinic officers" take inmates to and from the Jail's clinic. There is only one clinic officer on duty per shift. That officer obtains a list of inmates with clinic appointments, retrieves the listed inmates, takes them to the clinic, and places them in a clinic cell. As noted above, this was Thicklen's job during the April and November assaults.

Similarly, for attorney visits, a "floor control officer" informs the pod officer that an inmate has a visit, opens the housing pod doors so that the inmate can exit, and escorts the inmate to the hallway where the visit rooms are located. In this role, an officer controls the housing pod doors and access to the attorney visit rooms. The sixth floor of the Jail, where Thicklen was assigned to "floor control," also housed other female inmates besides Doe. For the July and September assaults, Thicklen was acting as a "floor control" officer.

Thicklen's other relevant role was as an SMU officer, the job he held during the October assault. SMU officers are charged with checking in on inmates, and they control what happens in the SMU, subject to oversight by supervisory officers. Male officers in the SMU are permitted to check on female inmates and enter their cells. SMU officers also distribute food, clothes, hygiene products, and mail. They have the power to discipline inmates in an effort to maintain order, and also assist inmates in filing grievances. When an inmate leaves the SMU, the SMU officer consults with the classification officers, who will determine where the inmate is housed

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 13 of 37   Document 157

going forward.[11] As an SMU officer, Thicklen checked in on Doe, asked her for sex, was refused, and then forced himself on her.

All correctional officers may request that an inmate be disciplined by being "placed in red." This means that the inmate will be given a red uniform and placed in segregated housing. If an inmate is "in red" for disciplinary reasons, she may be given a punitive diet call "nutraloaf." Doe feared that if she resisted Thicklen's advances, Thicklen would punish her by putting her "in red."

The Court makes an additional observation relevant to these facts. In answering requests for admission, Defendants have denied that certain of Thicklen's activities were within the scope of his employment because they depend on his intent, namely whether the act in question was sexually motivated or not. This requires that one believe Doe's account because, as noted above, Thicklen denies the assaults occurred. This is also true for

---

[11]Doe's statement that the "SMU officer has control over where an inmate will be housed after SMU" is half true. (Docket #154 at ¶ 64). The SMU officer would consult with classification officers regarding the inmate's behavior while in the SMU, and the classification personnel make the final decision. (Docket #145-24 at 99:22-107:24). Defendants misapprehend the stated fact, believing that it is relevant to placement *within* the SMU.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 14 of 37   Document 157

Defendants' interrogatory responses, which similarly state that Thicklen's conduct was outside the scope if it happened as Doe contends.[12]

### 3.5 Insurance

During 2013, the County was insured by a WCMIC insurance policy. *See* (Docket #26-1) (the "Policy"). Thicklen tendered a claim under the Policy related to the instant lawsuit. The Policy provides coverage for a number of categories of damages, including "(1) 'bodily injury and property damage caused by an occurrence'; (2) 'personal injury'; and (3) 'errors and omissions.'" (Docket #150 at ¶ 16). The Policy covers only an "insured," which for present purposes is a County employee acting within the scope of his employment or authority.

One coverage definition and one exclusion are relevant here. The Policy covers "personal injury" defined as "injury, other than bodily injury, …arising out of one or more of the following offenses: …6. Assault and battery, including sexual molestation; [and] …8. Other civil rights violations, including employment related violations." *Id.* at ¶ 19. Coverage for "personal injury" is subject to an exclusion when it arises out of "the intentional or knowing violation of a penal statute or ordinance committed by or with the consent of the insured." *Id.* at ¶ 22.

_____

[12]Defendants attempt to admit these facts with "qualifications" or "clarifications," but that is not appropriate for factual briefing. Any argument about the import of an asserted fact should be left to the corresponding memorandum of law. Both parties' factual briefing is replete with such legal arguments, so the Court will not belabor this point in each instance. The parties should rest assured that all "clarifications" and "qualifications" have been ignored. The Court trusts that all future motion practice will not contain this clearly improper form of argument.

Further, Defendants dispute regarding Interrogatories 8 to 12 is unfounded; Doe's fact is accurate as stated.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 15 of 37   Document 157

4. **ANALYSIS**

Defendants seek partial summary judgment, namely on Counts One, Three, and Four of Doe's First Amended Complaint. (Docket #133 at 1). Counts One and Three assert Defendants' *Monell* liability with regard to Thicklen's sexual assaults and the John/Jane Doe defendants' failure to intervene to stop them. (Docket #104 at 15-17). Count Four is a state law claim seeking to require Defendants to indemnify Thicklen and the John/Jane Doe defendants on any judgment entered against them. *Id.* at 18. WCMIC does not seek judgment on any particular claims, but instead requests entry of declaratory judgment that Thicklen is not covered under their insurance policy, and that it has no duty to defend or indemnify Thicklen in this matter. (Docket #129).

Defendants assert that they were not "deliberately indifferent" in their approach to sexual assaults at the Jail, and thus cannot bear liability for any constitutional violation. (Docket #133 at 4-21). They further argue that Thicklen acted outside the scope of his employment and that this relieves them of their obligation to indemnify him. *Id.* at 22-27. WCMIC similarly contends that Thicklen's assaults were not done in the scope of his employment, meaning that he would not be covered under their insurance policy. (Docket #131 at 4-12). It also argues that certain policy exclusions apply even if the Court determines that Thicklen is insured. *Id.* at 12-15.

Doe offers responses to each of these arguments, including addressing the "scope of employment" issue collectively. The Court will address the "deliberate indifference" claim first. It will next turn to the largely identical "scope" issues, which are potentially dispositive for WCMIC and impactful for the Defendants. Finally, the Court analyzes the applicability of policy exclusions.

### 4.1 Deliberate Indifference

Local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690).

Doe does not pursue the first or third theories of *Monell* liability. As to the second, the County will bear liability for its practices if Doe can show that it was deliberately indifferent to the known or obvious consequences of those practices, *i.e.*, that they would cause unconstitutional harm. *Thomas*, 604 F.3d at 303. Such practices must also be the "moving force" behind the constitutional violation. *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). The Seventh Circuit has not established "any bright-line rules defining a 'widespread custom or practice,'" other than that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. Once that threshold is reached, "the jury must make a factual determination as to whether the evidence demonstrates that the [County] had a widespread practice that [caused] the alleged constitutional harm." *Id.*

Doe's complaint asserts a *Monell* claim on two grounds: one for failure to train and another for failure to supervise Thicklen. They are assessed under the same standard. For these *Monell* derivatives, "the inadequacy of police training [or supervision] may serve as the basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The *Dunn* court explained:

> Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police.

*Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). In other words, "'[i]t may happen that…the need for enhanced training is so obvious, and the inadequacy of training is so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to the policymakers a deliberate indifference to those training needs.'" *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992) (quoting *Erwin v. Cnty. of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989)). Further "[Doe] must show that the failure to train [or supervise] reflects a conscious choice among alternatives that evinces a deliberate indifference[.]" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

### 4.1.1   Failure to Train

Doe asserts in her Complaint, and the Defendants seek summary judgment upon, a claim for failure to train. In her response, however, Doe concedes that she "does not proceed on the 'failure to train' or 'failure to discipline' theories of *Monell* liability and pursues only the 'failure to supervise' theory." (Docket #147 at 3 n. 1). The Court will, therefore, treat the failure-to-train claim as abandoned and the Defendants' request to dismiss

the same as uncontested. Defendants will be granted summary judgment on the issue.

### 4.1.2    Failure to Supervise

Doe's two avenues to prove the theory are as follows: 1) the County failed to supervise correctional officers when the lack of supervision presented an obvious potential for sexual assault, and that failure actually led to a sexual assault (which, for purposes of the instant motions, is presumed true), or 2) the County failed to provide additional or different supervision for correctional officers after learning of a pattern of sexual assaults in the Jail. *See Dunn*, 347 F.3d at 646.

Doe must also show causation. As noted above, *Monell* liability can only derive from unconstitutional practices which were the "moving force" behind the constitutional violation at issue. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Causation may be shown directly, "by demonstrating that the policy is itself unconstitutional," or indirectly, for instance when "a plaintiff cannot identify any formal policy that is unconstitutional," by pointing to "a series of bad acts creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.* (quotations omitted). For the latter method, the emphasis is on establishing a coherent series of "bad acts," rather random or isolated instances. *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003).

Defendants claim that they appropriately investigated and, if necessary, disciplined officers in each of the alleged prior instances of sexual misconduct. However, like her failure to train claim, Doe has expressly

waived a failure to discipline theory.[13] Thus, while Defendants' investigation of each incident may have been serious and thorough, the incidents are only relevant to *notice*, rather than the quality of each investigation.

In that vein, Doe makes two arguments that Defendants were on notice of a sexual assault problem. First, she contends that the Heine and Howard incidents, which included subsequent lawsuits and criminal convictions spanning from 2007 to 2012, revealed an obvious risk of sexual assault. She cites this Court's opinion in *Rankins* for the proposition that "when this Court denied the County's motion for Summary Judgment on nearly identical *Monell* claims based on assaults that occurred in 2009, it acknowledged that the County must have already had notice of the obvious risk in 2009." (Docket #147 at 11). The Court does not read that opinion as Doe does. Rather than finding notice as a matter of law, the Court held that material disputes of fact precluded such a finding. *Rankins*, 2012 WL 5932029 at *2-3. In fact, the Court made no reference at all to the type of notice Doe asserts here; it did not mention the Heine case or any other prior sexual assaults at the Jail. *Id.*

Defendants counter that the Heine and Howard incidents did not implicate the policies Doe now says are deficient. Her complaints are, generally put, that Defendants employed inadequate or non-existent policies on video surveillance, inmate tracking via the log and/or tier card systems, and permitting one-on-one contact between male officers and female inmates, all of which led to her assaults. Defendants note that as to Heine, neither Thomas' complaint, nor this Court's opinion on the County's motion

---

[13]Similarly, to the extent Doe may have sought to advance a failure to discipline claim at trial, Defendants will be granted summary judgment thereon.

to dismiss, referenced inadequate officer or inmate monitoring systems. As to Howard, Defendants contend that Rankins' lawsuit also failed to challenge their camera surveillance or other tracking systems. While Rankins' complaint did not specifically address those issues, the lawsuit did ultimately involve them. *See supra* Part 3.2, p. 6-8 and n. 6-8. Thus, the case could have provided some level of notice about problems with officer monitoring.

Based on the properly presented facts, the Court is left with the following events to support a finding of notice: 1) the Thomas/Howard assault, 2) the Rankins/Howard assaults and subsequent lawsuit, and 3) the Howard criminal conviction. The second and third events provided little or no notice. In Rankins' civil case, the jury found that the County had *not* implemented an unconstitutional policy or practice regarding Howard's supervision. *Rankins*, 11-CV-1153-JPS (Docket #85 at 2). Similarly, Howard's criminal conviction rested on his own conduct, not any County policy.

Despite her best efforts, then, Doe has presented only one prior incident of sexual assault that would supply meaningful notice to the Defendants on the issue of officer supervision—the Thomas/Howard assault.[14] Such a paucity of notice is precisely what defeats a *Monell* claim. *Thomas*, 604 F.3d at 303 ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance . . . or even three[.] But the plaintiff must demonstrate that there is a policy at issue rather than a random event.") (citations and

---

[14]Doe does not assert that the final substantiated sexual misconduct incident involving officer "D.W." saves her *Monell* claim, and the Court declines to pursue the argument for her. In any event, the incident is distinguishable. There, the sexual relationship between D.W. and the inmate was apparently consensual and there was no indication that the assaults occurred by exploitation of inadequate camera or inmate tracking policies. *See supra* Part 3.2.1.

quotations omitted); *Palmer*, 327 F.3d at 596 (two incidents of violence in cell blocks in one year "fails to meet the test of a widespread unconstitutional practice [regarding indifference to violence] by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law"); *Minix*, 597 F.3d at 832 (single incident does not show a series of bad acts sufficient to support deliberate indifference liability); *c.f. Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927-29 (7th Cir. 2004) (finding that the lack of a prior suicide does not defeat a suicide-based *Monell* claim when the defendant condoned violations of its own policies such that suicide "was a highly predictable consequence" of its laxity; further noting that the defendant's liability was "based on much more than a single instance of flawed conduct," but instead "repeated failures to ensure [the inmate's] safety" by the defendant's employees). Doe cannot, therefore, establish Defendants' notice based on the number or nature of prior instances of sexual misconduct.

Doe's second claim that Defendants had notice of an obvious risk of sexual assault is that "state and federal statutes explicitly prohibit all sexual contact between correctional officers and inmates." (Docket #147 at 11). The underlying proposition is of course true. *See* Wis. Stat. § 940.225(2)(h); 42 U.S.C. § 15602 (stating that one purpose of the Prison Rape Elimination Act is to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States[.]"). However, Doe's contention that general criminal proscriptions of such interactions put the County on notice that its officer monitoring policies were inadequate is not as clear.

Doe relies on the Second Circuit's opinion in *Cash* for support. *Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011). There, a jury returned a verdict in favor of the plaintiff, and against the government defendants, on her claim that their unconstitutional policies caused her to be raped by a sheriff's

deputy in the county jail. *Id.* at 331-32. The district court granted judgment to the defendants notwithstanding the verdict, finding that the evidence failed to show prior incidents of sexual assault, and thus did not establish the notice required for liability. *Id.* at 332. The Second Circuit reversed.

Doe characterizes *Cash*'s holding as follows:

> [W]here state law prohibits sexual contact between correctional staff and inmates and correctional officers have been trained on the law, one prior instance of sexual misconduct is enough to provide notice to the policymaker that criminal law prohibitions are insufficient to prevent sexual assault and further supervision is necessary[.]

(Docket #147 at 12). The Court acknowledges *Cash's* emphasis on the single prior incident and New York's criminal law against officer/inmate sexual contact were important to its findings on notice. *Cash*, 654 F.3d at 334-37. However, the Court finds more to *Cash* than this. In addition to the prior incident at the jail in question and the applicable criminal law, the defendants were aware of other "highly publicized" sexual assaults at other state prisons. *Id.* at 330-31. In fact, the defendants memorialized this concern in a memorandum on sexual misconduct, "issued to 'prevent what happened in other facilities from happening at the holding center[.]'" *Id.* at 331. Here, as noted above, Defendants seem to have had little or no prior notice of a sexual assault problem which was connected to deficient officer and inmate monitoring systems, much less any "highly publicized" incidents. The Court concludes that *Cash*'s holding is distinguishable, and because Doe does not cite any analogous Seventh Circuit precedent, the Court will not follow it.

In accordance with controlling precedent, Doe was required to come forward with evidence of an obvious potential for sexual assaults at the Jail, or a pattern of sexual assaults, either or both of which placed Defendants on

notice of the inadequacy of their supervision policies. *See Dunn*, 347 F.3d at 646. She has failed to do either. Doe's evidence and legal argument, when closely scrutinized, are insufficient to allow a reasonable jury to find the requisite notice. Thus, Defendants are entitled to summary judgment on Doe's *Monell* claims.[15] The Court does not reach the parties' arguments on the substance of "deliberate indifference" itself, namely the adequacy of Defendants' camera placement, inmate tracking, and male officer-to-female inmate supervision policies.[16]

---

[15] The Court clarifies the scope of this determination. Defendants mention Doe's failure to intervene claim against the John/Jane Doe defendants, Count III of the Amended Complaint, in their opening brief. (Docket #133 at 1). They appear to seek summary judgment on the *Monell* claim corresponding with Count III. *Id.* Doe has not yet identified the John/Jane Doe defendants who she claims failed to intervene to prevent Thicklen's assaults. Thus, the record for the associated *Monell* claim is undeveloped. Even without factual or legal briefing on the issue, Court has reservations about whether the two *Monell* claims are actually coterminous. However, because Defendants have requested summary judgment on the claim, and Doe has not explicitly opposed Defendants' request, the Court will grant Defendants summary judgment on the *Monell* claim in Count III. The parties must raise this issue separately if they believe this ruling is in error.

[16] The Court also need not rule on Defendants' primary contention on the notice issue. They argue that four substantiated rape reports, coming over a span of five years and from a circulating population of more than 200,000 inmates, is statistical evidence of the lack of a rape problem. Doe counters that the apparently low ratio of misconduct allegations to the number of prisoners does not show the lack of a problem. The Court would be inclined to agree; it would not draw a line that, as a matter of law, a certain statistical balance fails to give adequate notice. However, the statistics also do not *save* Doe's *Monell* claim. As discussed above, two of the substantiated assault reports gave no notice (Rankins), and one was entirely distinguishable (D.W.). The Court did conclude, in line with Seventh Circuit precedent, that a single incident is too little to create notice of an obvious risk or pattern of sexual assault. And, as with the D.W. incident, Doe failed to argue that the statistics should operate in her favor. In sum, the statistical argument aids nothing.

### 4.2 Scope of Employment

Both Defendants and WCMIC seek a ruling that Thicklen's sexual assaults were outside the scope of his employment. For Defendants, this means that they do not need to indemnify Thicklen as would otherwise be required pursuant to Wisconsin law. *See* Wis. Stat. § 895.46(1). For WCMIC, it means that Thicklen would not qualify as an "insured" under the policy they issued to the County, and thus he would not be entitled to coverage. Because WCMIC avoids coverage under an exclusion, *see infra* Part 4.3, the Court ignores it for the purposes of the scope question.

Wisconsin follows the Second Restatement of Agency with respect to this question. *Olson v. Connerly*, 457 N.W.2d 479, 498 n.10 (Wis. 1990). It uses the following factors to assess scope:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>> (a) it is of the kind he is employed to perform;
>> (b) it occurs substantially within the authorized time and space limits;
>> (c) it is actuated, at least in part, by a purpose to serve the master, and
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Id.* (citing Restatement (Second) of Agency § 228 (1958)).

Wisconsin courts hold that "normally, the scope-of-employment issue is presented to the jury because it entails factual questions on an employee's intent and purpose." *Block v. Gomez*, 549 N.W.2d 783, 787 (Wis. Ct. App. 1996); *see Stephenson v. Universal Metrics, Inc.*, 633 N.W.2d 707, 713 (Wis. Ct.

App. 2001) ("[W]e are mindful that a question of intent can rarely be resolved by the court as a matter of law. Additionally, whether an employee acts within the scope of his or her employment is generally a fact issue to be decided by a jury.") (citation omitted). Still, "'generally' and 'rarely' do not mean 'always' and 'never.' When there is no genuine issue of material fact, even if the concern is whether an employee was acting within the scope of her employment, summary judgment may be proper." *Korntved v. Advanced Healthcare, S.C.*, 704 N.W.2d 597, 603 (Wis. Ct. App. 2005). As with any summary judgment determination, the material facts must not be in dispute and the reasonable inferences therefrom must lead to only one conclusion. *See Cameron v. City of Milwaukee*, 307 N.W.2d 164, 170 (Wis. 1981).

As to the purpose element, § 228(1)(c), *Olson* further describes its contours:

> [A]n employee may be found to have acted within the scope of his or her employment as long as the employee was at least partially actuated by a purpose to serve the employer. There is no requirement that serving the employer must be the employee's only purpose or even the employee's primary purpose. Rather, an employee's conduct is not within the scope of his or her employment if it is too little actuated by a purpose to serve the employer or if it is motivated entirely by the employee's own purposes (that is, the employee stepped aside from the prosecution of the employer's business to accomplish an independent purpose of his or her own).

*Id.* at 499-500. In the context of police officer misconduct, which Doe analogizes to the instant case, the Seventh Circuit has held that "a police officer can grossly exceed his authority to use force and still be found to have acted within the scope of his employment," even when, while off-duty, shooting more than a dozen bullets at an unarmed suspect after merely being

tailgated by the suspect. *Javier v. City of Milwaukee*, 670 F.3d 823, 824, 830 (7th Cir. 2012).

There is substantial case law in Wisconsin and in this District on the interplay of employee sexual misconduct and scope. Some cases find that such activity is outside the scope by characterizing the conduct as clearly prohibited by employer policy, *Doe v. St. Francis School Dist.*, 834 F.Supp.2d 889, 901 (E.D. Wis. 2011), having nothing to do with the employer's interests, *Doe v. Time Warner Cable of S.E. Wisconsin, L.P.*, No. 07-CV-781-WCG, 2007 WL 4143226 *3 (E.D. Wis. Nov. 19, 2007), or being too different from the employee's authorized duties, *S.V. v. Kratz*, No. 10-CV-919-WCG, 2012 WL 5833185 *7 (E.D. Wis. Nov. 16, 2012); *see also Block*, 549 N.W.2d at 788 (therapist violated clinic known clinic policy forbidding sexual contact with patients, and thus "undisputedly stepped aside from the Clinic's business to procure a purely personal benefit; that is, a sexual relationship with [the plaintiff].").

Other courts have found that sexual misconduct is not necessarily outside the scope. In *Watts*, this Court addressed the Heine case on summary judgment. *Watts*, 2008 WL 4058032; *see supra* Part 3.2, n.5. It found that a reasonable factfinder could conclude that "Heine's sexual misconduct was not wholly disconnected from the scope of his employment." *Id.* at *4. Specifically, the jury could infer that "his supervision of and interaction with inmates, both inside and outside of their cells, was part of his job and the sexual assault was only made possible by virtue of his status as a deputy sheriff." *Id.* Because of the competing inferences relating to scope, this Court found that summary judgment for the County was not proper. *Id.* at *5.

In *Lemons*, a police officer raped a person in her home while responding to her 9-1-1 call. *Lemons v. City of Milwaukee*, No. 13-CV-331-CNC,

2016 WL 3746571 *1 (E.D. Wis. July 8, 2016). Judge Clevert held, like *Watts*, that a reasonable inference could be made that the officer acted within the scope. *Id.* at *24-25. This was true even though the assailant admitted that he had acted for his own sexual pleasure. *Id.* at *24. Judge Clevert found that while the admission weighed heavily against a scope finding in the plaintiff's favor, the evidence was balanced by similar objective factors to those discussed in *Watts*. *Id.* at *24-25. Namely, the officer's intrusion into the plaintiff's home was part of his job duties, since "Lemons's home was Cates's workplace" because he had been sent there for the 9-1-1 call. *Id.* at *24. The officer was on-duty, in uniform, and carrying his department-issued firearm, and from those facts a jury could find that "Cates used his power as a police officer and possession of a weapon to gain control over Lemons." *Id.* Further, the officer's sexual assault happened during his otherwise appropriate investigative duties. *Id.* Judge Clevert found it important that the plaintiff had also been part of a physical altercation before the officer arrived, so "Cates's act of subduing Lemons may be viewed as his way of exerting control over the reported situation." *Id.* In accordance with the standard of review, Judge Clevert concluded that "whether Cates stepped aside from serving his employer for a sexual frolic or instead raped Lemons as part of the continuum of the investigation is a question for trial." *Id.* at *25.

Judge Greisbach reached a contrary result in *Kratz*, another sexual misconduct case. There, a district attorney sent sexually explicit text messages to a victim he had recently met in conjunction with prosecuting her abuser. *Kratz*, 2012 WL 5833185 at *1-2. Judge Greisbach found that sexual misconduct is unlike when a police officer is accused of using excessive force, because while at least some force is a regular element of an officer's duties, sexual activity is "never a part of the job description." *Id.* at *4. The court

found "no rational connection between the messages . . . and a good faith intent on Kratz's part to serve his employer's interests." *Id.* at *5. Judge Griesbach further noted that the attorney had knowingly violated applicable policies. *Id.* at *6. In sum, "the messages transparently [sought] a sexual relationship with Plaintiff, and [did] not relate to any conceivable prosecution function," and so summary judgment was appropriate in the state's favor. *Id.* at *6-7.

These citations reveal that courts disagree on two key components of the scope analysis: 1) whether sexual misconduct can, at any stretch, be considered the kind of conduct the employee is employed to perform, and 2) whether the employee's intent to serve the employer can be inferred from the employee's misconduct, rather than requiring direct, conclusive evidence of intent. As to the first component, Defendants urge the Court to follow *Kratz* and rule that sexual misconduct, as a categorical matter, cannot be related to the conduct the employee was hired to perform.[17] In this instance where precedent seems to diverge on an issue, the Court is constrained to

---

[17]Defendants take *Kratz* too far, at any rate. Judge Griesbach noted, after discussing cases finding sexual misconduct was outside the scope:

> This is not to say that the mere fact that a governmental officer or employee is accused of sexual misconduct removes him from the protection of the indemnification statute as a matter of law. If the acts alleged are unclear or can be reasonably viewed as furthering a purpose other than the employee's own sexual desires, summary judgment would be inappropriate.

*Kratz*, 2012 WL 5833185 at *5. The Court's analysis below demonstrates that Thicklen's "purpose" is arguable.

follow that with the most closely analogous facts. Here, that is *Watts*; the facts are nigh indistinguishable.[18]

Defendants argue that "no reasonable argument can be made that any sexual contact between Thicklen (while he was a corrections officer in the Milwaukee County Jail) and plaintiff (while she was a prisoner in the Jail) was within the scope of Thicklen's employment." (Docket #133 at 25). This is too narrow a construction of the relevant facts. Of course, each discreet sex act has nothing to do with being a correctional officer. However, viewing the facts most favorably to Doe, the other objective aspects of each assault could create the opposite inference.

Thicklen's assaults occurred while he was on-duty, wearing his uniform, and carrying his Jail-issued taser. He wielded disciplinary authority over Doe and in fact made a general reference to his authority in one of the encounters, telling Doe that "I'm in gray, you're in blue." Like the *Lemons* officer, in the various roles Thicklen performed during the assaults, he was at least empowered to be where Doe was (the clinic and SMU cells) or take her to the places where he could assault her (the attorney visit rooms). Of course, he lacked specific authorization to do any of those acts, but being near, interacting with, and transporting Doe was within his duties. As in *Watts*, the Court finds that a jury could reasonably infer that Thicklen's assaults stemmed from and were made possible by his employment as a correctional officer.

This is not to say that Doe's position is without significant pitfalls; she will have a tall task to convince a jury that Thicklen's conduct was, at least

---

[18]Defendants apparently recognize this as they make no attempt to distinguish it in their reply.

to some degree, of the kind he was employed to perform. The County's prohibition on officer/inmate sexual contact, and Wisconsin's criminal proscription of the same, combined with Thicklen's admission that he was aware of both, weighs heavily against her. Nevertheless, the evidence before the Court shows that competing inferences can be reasonably drawn, and the question is therefore reserved to the jury.

This decision is buttressed by an analysis of the intent component. It is clear that "[m]uch of the analysis of whether an employee acts within the scope of employment focuses on the employee's intent at the time." *Stephenson*, 633 N.W.2d at 712; *see also Olson*, 457 N.W.2d at 498-99. Here, the parties vigorously dispute Thicklen's subjective intent in their briefs. However, neither party actually offered a statement of fact directly addressing the issue, probably because each knew the other would dispute it. In light of courts' heightened reluctance to determine intent as a matter of law, *Stephenson*, 633 N.W.2d at 713, the Court concludes that the dispute regarding Thicklen's intent also precludes summary judgment.[19]

This result is not avoided by simply assuming the truth of Doe's allegations, and concluding therefrom that Thicklen's sole intent was to have sex with Doe prior to and during each of the five assaults. The Court will not infer subjective intent, to the exclusion of all other inferences, stemming from the objective factors discussed above; that is an inference the jury must draw

---

[19]Moreover, Defendants' failure to present Thicklen's intent in any statement of fact means that they did not provide the Court with sufficient undisputed facts to show that judgment is appropriate in their favor. *Boss*, 816 F.3d at 916; *Cameron*, 307 N.W.2d at 170 ("To decide a motion for summary judgment, a trial court must determine **whether all material facts are present**, whether material facts are in dispute and whether reasonable inferences leading to conflicting results can be drawn from undisputed facts.") (emphasis added).

and weigh against other competing evidence. In short, whether Thicklen "stepped aside from serving his employer for a sexual frolic or instead raped [Doe] as part of the continuum of [his duties]" is a question of fact solely within the jury's province. *See Lemons*, 2016 WL 3746571 at *25; *see also Javier*, 670 F.3d at 831 ("[T]he key question . . . [is] whether [the officer] was acting as a vigilante for his own purposes or as a police officer when he shot [the suspect].").

### 4.3 Policy Exclusions

WCMIC contends even if Thicklen acted within the scope of his employment, several exclusions eliminate coverage for Thicklen's actions under the Policy. In Wisconsin,

> [t]he interpretation of an insurance contract is a question of law, which this court reviews de novo. An insurance policy is to be construed so as to give effect to the parties' intentions. The contract's words are to be given their common and ordinary meaning, and when the policy language is plain and unambiguous, we enforce the contract as written and without resorting to the rules of construction or principles from the case law. If the contract language is ambiguous, i.e., if it is susceptible to more than one reasonable interpretation, the language is construed in favor of coverage.

*Plastics Engineering Co. v. Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 620 (Wis. 2009) (citations and quotations omitted). Because the first of WCMIC's cited exclusions applies, the Court will not address the others.

WCMIC asserts that the Policy excludes personal injury "[a]rising out of the intentional or knowing violation of a penal statute"(a "penal statute exclusion"), and that Thicklen committed a felony under Wisconsin law by violating Section 940.225(2)(h). *See supra* Parts 3.3 and 3.5. It claims that a number of courts have concluded that similarly-worded exclusions apply in

instances of sexual misconduct. *See Gillund v. Meridian Mut. Ins. Co.*, 778 N.W.2d 662, 670-71 (Wis. Ct. App. 2009) (penal statute exclusion applies to misdemeanor, non-consensual nude video recording, even though actor was not convicted); *National Fire and Cas. Co. v. West By and Through Norris*, 107 F.3d 531, 537 (7th Cir. 1997) ("The underlying conduct for which [the victim] seeks damages involves intentional acts of child molestation and false imprisonment. Both offenses clearly are prohibited by the Indiana penal code. . . . Therefore, under the clear and unambiguous language of the policy [exclusion], no coverage would apply to [the actor's] actions."); *Carney v. White*, 843 F. Supp. 462, 476 (E.D. Wis. 1994), *aff'd* 60 F.3d 1273, 1280-81 (7th Cir. 1995).

Doe responds in two ways. First, she claims that the Policy is ambiguous. Unlike the policies in WCMIC's citations, the Policy expressly provides coverage for "personal injury," including "assault and battery, including sexual molestation[20][.]" (Docket #26-1 at 27-28). The Policy also covers "other civil rights violations, including employment-related violations." *Id.* at 28. Doe finds that the Policy's attempt at granting, then excluding, coverage for the same types of occurrence renders it illusory. *Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1345-46 (7th Cir. 1995) ("These provisions—the definition of personal injury which includes intentional torts and the definition of 'occurrence' which excludes intentional torts—are ambiguous and create an internal inconsistency; on the one hand Cincinnati purports to provide coverage for intentional tort claims, and on the other hand Cincinnati denies coverage for those same claims. . .

---

[20]"Sexual molestation" is further defined as "the actual or attempted or alleged sexual contact of a person[.]" (Docket #26-1 at 28).

. This ambiguity in the Cincinnati policy must be resolved in favor of the insured.").

It is clear that Thicklen's actions, if Doe's allegations are true, violated criminal law. He was a Jail employee and had various types of sexual contact with Doe. *See* Wis. Stat. § 940.225(2)(h). Neither intent nor consent absolve these crimes. *Id.* at (2)(h) and (4). In the parties' factual briefing, WCMIC states these as facts, and Doe objects that they are legal conclusions. (Docket #150 ¶¶ 13-15). However, she fails to dispute the underlying facts of the assaults, nor could she, as that would undermine the foundation of her complaint.[21] Thus, the penal statute exclusion seems to apply.

Doe claims that *Gillund* supports her conclusion that the Policy is illusory, and thus the Court must rule in favor of coverage. It does not provide the support she seeks, however. In *Gillund*, the court assumed that coverage existed for an invasion of privacy. *Gillund*, 778 N.W.2d at 669. Because the violation of criminal law regarding invasions of privacy was undisputed, it found that the penal statute exclusion applied. *Id.* at 670-71. The plaintiff argued, as does Doe, that the express grant of coverage for invasion of privacy, combined with the withdrawal of coverage under the penal statute exclusion, rendered coverage illusory. *Id.* at 671.

The court found that to assess whether coverage was illusory, it must determine "whether any foreseeable set of circumstances exist where [the insurer] would be required to provide coverage for an invasion of privacy that does not violate a penal law. . . . Expressed differently: can a civil

---

[21]The only avenue for escaping the statute is that it "does not apply if the individual with whom the actor has sexual contact . . . is subject to prosecution for the sexual contact[.]" Wis. Stat. § 940.225(2)(h). Neither Doe nor any other party has indicated that Doe is subject to prosecution as a result of the Thicklen's assaults.

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 34 of 37   Document 157

invasion of privacy occur that does not violate a criminal law?" *Id.* In comparing the elements of civil and criminal invasions of privacy, it concluded that the penal statute had a narrower scope. *Id.* at 671-72. Accordingly, civil liability could arise without criminal liability. *Id.* at 672.

Pursuant to *Gillund*, the Court must decide whether the Policy's sexual molestation coverage is coterminous with Wisconsin criminal law. Doe contends that "it is difficult to imagine a situation where sexual assault does not violate a penal statute, and WCMIC certainly has not suggested any such situations." (Docket #149 at 6). WCMIC cites one in its reply that the Court finds persuasive. It notes that the penal statute exclusion only applies when the criminal act was "committed by or with the consent of the insured." (Docket #26-1 at 23). WCMIC explains that coverage can exist for the County for personal injury, even when the injury was not inflicted by a County employee. For example, the County may be liable to a foster child if the child is placed in a home and then sexually assaulted by someone in that home. The child may sue for the County's improper decision to place the child in that home. The injury to the child would fall under the sexual molestation portion of the "personal injury" umbrella, and thus the County would have coverage, but the assault would not have been committed by, or with the consent of, a County employee.[22]

---

[22] WCMIC's example comports with the Policy's plain language, which gives coverage for "those sums that the insured becomes legally obligated to pay as damages because of: . . . Coverage B - Personal Injury[.]" (Docket #26-1 at 17). Coverage itself, then, is not limited to things done or caused by County employees, but extends to any "personal injuries" the County must pay for, including those raised pursuant to a civil lawsuit.

This example reveals that the Policy's provisions do not conflict, and are thus not illusory. Because the penal statute exclusion applies, the Court must find that WCMIC need not provide coverage to Thicklen for his alleged conduct. The Court will, therefore, grant WCMIC's motion and issue declaratory judgment as it requests.

**5.    CONCLUSION**

In light of the foregoing, Doe's *Monell* claims arising from Counts One and Three of the Amended Complaint must be dismissed, while Count Four's indemnification claim remains in effect. Declaratory judgment will issue in favor of WCMIC and it will be dismissed from this action.

Accordingly,

**IT IS ORDERED** that defendants County of Milwaukee and David A. Clarke, Jr.'s motion for partial summary judgment (Docket #132) be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that intervenor Wisconsin County Mutual Insurance Corporation's motion for summary judgment (Docket #129) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that intervenor Wisconsin County Mutual Insurance Corporation be and the same is hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the following is declared by the Court:

(1) There is no insurance coverage available to Defendant Xavier D. Thicklen under the Public Entity Liability policy of insurance issued by WCMIC to Milwaukee County for the actions of Defendant Xavier D. Thicklen as asserted by Plaintiff Jane Doe in this action; and

(2) Intervenor WCMIC has no duty to defend or indemnify Defendant Xavier D. Thicklen for any of the claims asserted by Plaintiff Jane Doe against Defendant Xavier D. Thicklen in this action.

**IT IS FURTHER ORDERED** that defendant Xavier D. Thicklen's motion to join the plaintiff's briefing in opposition to summary judgment (Docket #151) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 1st day of December, 2016.

BY THE COURT:

s/ *J. P. Stadtmueller*
J.P. Stadtmueller
U.S. District Judge

Case 2:14-cv-00200-JPS   Filed 12/01/16   Page 37 of 37   Document 157